In re Bruce S. FIGLER Debtor.

DirecTV, Inc., Plaintiff

v.

Bruce S. Figler, Defendant.

Bankruptcy No. 07–25039–JKF.
Adversary No. 07–2480.

United States Bankruptcy Court,
W.D. Pennsylvania.

June 25, 2009.

Alan E. Cech, Morella & Associates, Pittsburgh, PA, for Plaintiff.

Dai Rosenblum, Butler, PA, for Defendant.

**Related to Adv. Doc. No. 13, Motion for Summary Judgment filed on behalf of DirecTV, Inc.**
**MEMORANDUM OPINION[1]**

JUDITH K. FITZGERALD,
Bankruptcy Judge.

The matter before this court is DirecTV's motion for summary judgment regarding its complaint to determine dischargeability of debt. We find summary judgment in favor of DirecTV to be appropriate on this record. Therefore, the District Court judgment awarding DirecTV $70,450 in damages is not dischargeable.

*Introduction*

On May 21, 2004, DirecTV initiated civil litigation in the United States District Court for the Western District of Pennsylvania, Civ. A. No. 04–773, against Bruce S. Figler ("Debtor"), alleging (1) violations of the Cable Communications Policy Act of 1984, 47 U.S.C. § 605(a) ("unauthorized publication or use of communications"), (2) the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2511 ("Interception and disclosure of wire, oral, or electronic communications prohibited"), and (3) 18 Pa. Cons.Stat. § 910 (entitled "Manufacture, distribution, use or possession of devices for theft of telecommunications services") regarding use or possession of devices for theft of telecommunications services. After a three day trial, the jury returned a verdict against Debtor totaling $70,450 in statutory damages.[2] Civ. A. Doc. No. 146. An order entering judgment was issued on April 13, 2007. Civ. A. Doc. No. 147. The judgment included an award of $1,000 for each of two violations of § 605(a) (unauthorized interception of radio transmissions), $10,000 for each of

1. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. The court's jurisdiction was not at issue.

2. After the District Court entered its judgment, DirecTV filed a "Motion for Attorney Fees and Nontaxable Costs" which had not been decided when this bankruptcy case was filed. *See* Civ. A. No. 04–773, Doc. No. 153. DirecTV filed a motion in Bankruptcy No. 07–25039, Doc. No. 29, for relief from stay to permit the parties to return to the District Court to have the fee motion decided. The motion for relief from stay was continued until such time as this court schedules a hearing on Debtor's amended plan. *See* Bankr. Doc. No. 46, Order of July 31, 2008. The amended plan is due to be filed after this court rules on the merits of this dischargeability action. *See* Bankr.Doc. No. 44, Order of July 29, 2008. However, on February 11, 2008, the District Court entered an order granting in part DirecTV's prepetition motion for attorney's fees and for costs. Civ. Doc. No. 159.

two violations of § 605(e)(4),$47,700 for 477 days of violation of § 2511 (§ 2520 sets forth the formula for determining the amount of damages for violations of § 2511), and $750 for three violations of § 910.

The complaint filed in District Court was based on an investigation and subsequent raid of an internet company called White Viper. The Digital Millenium Copyright Act, (Pub.L. 105–304, Title II, § 202(a), Oct. 28, 1998, 112 Stat. 2877, and amended Pub.L. 106–44, § 1(c)(1), 1(d), Aug. 5, 1999, 113 Stat. 221, 222) made it illegal to traffic in any device that was designed to overcome encryption technology. Adv. Doc. No. 36, Tr. 4/9/07 at 29–30. It permitted entities such as DirecTV to apply to a federal judge for a seizure order to go to the location where the devices were being distributed and seize those devices. DirecTV received such an order. A condition of obtaining that order was the filing of a civil lawsuit against the distributor. *See* 17 U.S.C. § 512. DirecTV received an order authorizing the seizure. Based on records seized during the raid, DirecTV filed a civil suit against Debtor in the District Court. After judgment was entered against him, Debtor filed this bankruptcy case on August 9, 2007. On September 18, 2007, DirecTV filed a complaint objecting to the dischargeability of its judgment on the basis of 11 U.S.C. § 523(a)(2) and (4) and § 1328(a)(2),[3] and filed the motion for summary judgment now at bench on January 7, 2008. Adv. Doc. No. 13.

On March 28, 2008, a hearing was held on the motion for summary judgment at which time the parties were ordered to meet and confer in an effort to settle and, if a settlement agreement was not filed by May 15, 2008, DirecTV was ordered to provide this court with a copy of the District Court trial transcript no later than June 15, 2008. *See* Adv. Doc. No. 23, Proceeding Memo of March 20, 2008, hearing. Instead, DirecTV filed a motion to have the question of dischargeability determined in the absence of a transcript, which we denied in a Memorandum Opinion published at 391 B.R. 565 (Bankr. W.D.Pa.2008). DirecTV filed the transcript on September 8, 2008, at Adv. Doc. Nos. 36, 37, 38. We have examined the transcript of the hearing and conclude that the elements of § 523(a)(2) are not met but that under § 523(a)(4) the debt to DirecTV is nondischargeable.

The jury found that the Debtor had violated § 605(a)[4] and § 605(e)(4).[5] *See*

---

**3.** The dischargeability complaint included a reference to § 1328(a)(2) which provides that in chapter 13 cases certain debts, including those "of the kind specified" in § 523(a)(2) and § 523(a)(4), are nondischargeable.

**4.** Section 605(a) provides, in pertinent part that, with certain exceptions not applicable here:

no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish ... such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for

Civ. A. Doc. No. 146. Section 605(a) of title 47 of the U.S.Code specifically prohibits certain conduct.

Section 2511(1)(a) of title 18 of the United States Code proscribes, *inter alia,* the intentional interception or disclosure of, or use of devices to intercept, certain types of communication.[6] Section 2520 provides that "any person whose wire, oral, or electronic communication is intercepted ... may in a civil action recover from the person which engaged in that violation."[7]

The jury also concluded that Debtor violated § 910[8] of title 18 of the Pennsylvania

the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents ... knowing that such communication was intercepted, shall divulge or publish ... such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto....

5. Subsection (e)(4) provides:

Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both.

6. Section 2511(a) provides, in pertinent part:

(1) Except as otherwise specifically provided in this chapter any person who—

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when-

(i) such device ... transmits a signal through, a wire, cable, or other like connection used in wire communication; or

(ii) such device transmits communications by radio, or interferes with the transmission of such communication; or

(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; ...

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; ...

shall be punished as provided in subsection (4)[providing for fines or imprisonment or both] or shall be subject to suit as provided in subsection (5) [regarding suit by the Federal Government].

Under § 2511 the Federal Government is entitled to injunctive relief for the first offense and thereafter there is a mandatory civil fine. *See* § 2511(a)(5)(a)(ii)(A) and (B):

(A) if the violation of this chapter is a first offense for the person under paragraph (a) of subsection (4) and such person has not been found liable in a civil action under section 2520 of this title, the Federal Government shall be entitled to appropriate injunctive relief; and

(B) if the violation of this chapter is a second or subsequent offense under paragraph (a) of subsection (4) or such person has been found liable in any prior civil action under section 2520, the person shall be subject to a mandatory $500 civil fine.

*See also* § 2511(a)(5)(b).

7. Remedies under § 2520 include equitable or declaratory relief, damages and punitive damages, and attorney's fees and litigation costs.

8. Section 901 provides for a civil action by "[a]ny person aggrieved by a violation" of the section.

Consolidated Statutes. Civ. A. Doc. No. 146. That section prohibits any conduct that "makes, distributes, possesses, uses ... or modifies, alters, programs or reprograms a telecommunication device designed, adapted or which can be used: (i) for commission of a theft of telecommunication service ..."

*Standard of Proof*

■ The evidence submitted is comprised of the jury trial transcript. "[A] bankruptcy court could properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and that were actually litigated and determined in the prior action." *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "Collateral estoppel is applicable if the facts established by the previous judgment ... meet the requirements of nondischargeability listed in" § 523(a)(2) and (a)(4). *In re Docteroff*, 133 F.3d 210, 215 (3d Cir.1997). *Grogan* also noted that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." 498 U.S. at 291, 111 S.Ct. 654. *See In re Hilley*, 124 Fed.Appx. 81, 82 (3d Cir.2005) (noting that "[t]o obtain relief under [§ 523(a)(2)(A) ], a creditor must prove its claim by a preponderance of the evidence"); *Chao v. Rizzi*, 2007 WL 2317335, at *2 (W.D.Pa., Aug. 8, 2007) (noting that "[o]n a claim of nondischargeability under § 523(a)(4), ... the applicable level of proof is a preponderance of the evidence"). The preponderance of the evidence standard applies in civil cases with respect to violations of 47 U.S.C. § 605(a), 18 U.S.C. § 2511(a), and 18 Pa.Cons.Stat. § 910(a). *Cf. DIRECTV, Inc. v. Walsh*, 2006 WL 3308668, at *1 (M.D.Pa. Oct. 12, 2006) (noting that DirecTV met the preponderance of the evidence standard with respect to 47 U.S.C. § 605(a), 18 U.S.C. § 2511(a), and 18 Pa.Cons.Stat. § 910(a)).

Thus, the burden of proof for nondischargeability under § 523(a)(2) and (a)(4) are the same as that for the statutes used in the District Court proceeding. Based upon the District Court trial transcript, we find that the facts, legal standards, and issues actually litigated in the District Court establish that the judgment is nondischargeable under § 523(a)(4) but not under (a)(2).

*Facts*

DirecTV's complaint against Debtor was filed in the District Court at Civ. A. No. 04–773 after DirecTV, in coordination with law enforcement, conducted a raid of White Viper, an internet company. The raid uncovered records establishing sales to Debtor of certain devices designed for stealing satellite television signals, specifically DirecTV signals.

Larry E. Rissler testified on behalf of DirecTV. He began working for DirecTV in 1994 and served as vice president of its Office of Signal Integrity. At the time of trial, although he had retired from DirecTV in 1995, he continued to serve as a consultant. Prior to taking his position with DirecTV, Mr. Rissler had been deputy director for the Worldwide Anti–Piracy Association for the Motion Picture Association of America and had worked for the Satellite Broadcasting and Communications Association as special counsel for the Associations' anti-piracy task force. Before that he spent 25 years as a special agent for the Federal Bureau of Investigation. Adv. Doc. No. 36, Tr. 4/9/07 at 2–4. He testified that, a few months before he joined the DirecTV Office of Signal Integrity, DirecTV had begun broadcasting its signal and was concerned about theft of programming based on the theft of services experiences of the cable and "big dish" (C-band) satellite industry. He monitored threats to encryption technology

which materialized in 1995. *Id.* at 5. He then worked to identify those who developed the hacking technology and those who trafficked in it. *Id.* The traffickers were easy to identify because they had to advertise their products. *Id.* at 6. White Viper was very active in 2000 and 2001 and advertised many items designed to allow interception of DirecTV's programming. DirecTV hired private investigators to buy devices then had electrical engineers examine the devices to confirm that they were used for piracy. DirecTV sued White Viper and obtained White Viper's records.

The pirating activities were directed to access "smart" cards, each of which contains a computer chip. At the time of the District Court trial, DirecTV was on the fifth generation of access card, each generation necessitated by successful attempts to hack the prior card. The smart card programming works by the operation of orbiting satellites which deflect a signal to Earth and which DirecTV receivers collect and route to integrated receiver decoders. *Id.* at 8–10. A customer who subscribes to DirecTV must call the company and relay the card's 12 digit number. DirecTV, via computer, activates the service by communicating with a satellite. Thereafter, the authorized channels can be viewed by the customer. *Id.* at 9–10. Telephone lines are used to identify the viewing household for billing purposes.

DirecTV has two types of programming: subscription programming, which gives the customer the same channels every month for a set price, and pay-per-view events. Adv. Doc. No. 36, Tr. 4/9/07 at 11. When a pay-per-view event is purchased, a computer chip in the access card records that fact and once a month transmits the information to DirecTV via the telephone wire for billing purposes. *Id.* at 11–12. Before his service was terminated for nonpay-

ment, Debtor viewed a large number of pay-per-view events. *Id.* at 51.

In the early days of satellite piracy, hackers used a counterfeit access card. Later on, the pirate community developed technology to reprogram the software that resides in the computer chip and the access card. *Id.* at 14–15. The second wave of piracy involved the purchase and sale of hacked access cards. Hardware devices became available after that and individual end users could purchase and reprogram the access cards themselves. Evidence at trial established that access cards by design are resistant to reprogramming because that is a fundamental part of DirecTV's copyright protection system. Adv. Doc. No. 37, Tr. of 4/10/07 at 71. Thus, while, in theory, a DirecTV access card could be reprogrammed to serve other non-DirecTV functions, it would be difficult to do so because necessary information such as the memory available on the card and what programs it would be capable of running would not be available. *Id.* at 71–72.

Typically, the software that was used to reprogram the cards was obtained by downloading it from pirate websites. Adv. Doc. No. 36, Tr. 4/9/07 at 15. One of the hacking devices was a reader/writer (card reader) sold by White Viper. It could be used to reprogram the software that resides in a DirecTV access card. The access card would be taken out of the receiver and inserted in a slot on the front of the reader/writer. On the back of the reader/writer is a place to connect a cable which would be connected to a computer. The access card would be reprogrammed by downloading software. Adv. Doc. No. 36, Tr. 4/9/07 at 14–15. DirecTV attempted to combat piracy by developing new encryption technology with a new access card each time a previous card had been compromised and the encryption technolo-

gy defeated. *Id.* at 18. DirecTV's engineering department also routinely ran "electronic counter-measures" (ECMs) to find and disable unauthorized access to its programming. *Id.* at 20. ECMs were run on a regular basis. *Id.* at 20–21. In the year 2000 DirecTV engineers began sending software updates or downloads through the datastream, preparing for a major electronic counter-measure and, on January 21, 2001, DirecTV launched an ECM that shut down all of the hacked cards in existence at the time. This became known as the "Black Sunday ECM." *Id.* at 21.

Immediately after the Black Sunday ECM, DirecTV began receiving reports from retail outlets that people were buying multiple systems. The retailers reported that later they would find the box in the trash and the only thing missing was the access card. *Id.* at 22. The newer systems contained a different access card and the rush to buy new systems was to get the new access cards which were not subject to the Black Sunday ECM. *Id.* at 23.[9] Mr. Rissler also testified to the existence of another website, infositeonline.com, Adv. Doc. No. 37, Tr. 4/10/07 at 34–36, a link to which was found on White Viper's site and which advertised the WildThing unlooper software used to reprogram access cards. Adv. Doc. No. 36, Tr. 4/9/07 at 35–36. The smart cards come with a program that, to counter piracy, downloads small programs that run on the card and, if a change in the card is detected that indicates possible piracy, the "little program" will disable the card. Adv. Doc. No. 37, Tr. 4/10/07 at 25. The pirate community refers to that result as the card having been "looped" because of the way the program operates. Adv. Doc. No. 37, Tr. 4/10/07 at 26. Thus, the unlooper was created to return the access card to performing its original function. The unlooper does so by sending an electrical stimulation to the access card that breaks the "loop" function; the unlooper has circuitry that allows the loop to be broken. *Id.*[10]

One of the records DirecTV obtained in the White Viper raid showed that Debtor bought a type of WildThing unlooper and Debtor admitted he had purchased one. Adv. Doc. No. 36, Tr. 4/9/07 at 42. *See* Adv. Doc. No. 38, Tr. 4/11/07 at 3, 4. The purchase occurred in July of 2000 and a credit card record of the purchase existed. Adv. Doc. No. 36, Tr. 4/9/07 at 44. Debtor testified that he bought it because he was inventing something that would use ammonia tanks to compress air which would provide cooling and heating to buildings. Adv. Doc. No. 37, Tr. 4/10/07 at 38.

William Gatliff also testified. He is a computer designer who works with embedded computer systems. Adv. Doc. No. 37, Tr. 4/10/07 at 3–5. DirecTV is one of his clients and is an embedded system, as are smart cards and unloopers. *Id.* at 6. Some, but not all, card readers/writers are

9. With an unlooper or a reader/writer a pirated card could be recoded for use in other DirecTV receivers. Adv. Doc. No. 37, Tr. 4/10/07 at 53. By buying a new DirecTV system and obtaining new access cards, the coding process could be performed on all of them. *Id.* at 54.

10. A DirecTV access card has its own "command loop." In order to get data from a DirecTV receiver, the receiver has to be able to receive commands and those commands come through electrical contacts on the access card. The program in the computer (the smart card) that is "listening" for the commands is a "command loop." When an ECM is enacted to disable a pirated access card, another loop is added to the program in the smart card. The result is that the command loop does nothing but spin in a loop. An unlooper causes a malfunction in the programming that breaks that loop and permits TV viewing to resume. Adv. Doc. No. 37, Tr. 4/10/07 at 74–75.

embedded systems but all unloopers are embedded systems. *Id.* Mr. Gatliff analyzed the White Viper reader and unlooper and concluded that their only use was to hack DirecTV's signals. *Id.* at 22. Mr. Gatliff testified that the WildThing unlooper was designed specifically for hacking DirecTV signals because the device is so tied to the unlooping operation it is not useful for anything else. Adv. Doc. No. 37, Tr. 4/10/07 at 29.[11] The unlooping operation is so specific to piracy that, according to Mr. Gatliff, there are authoritative texts that apply a term, "glitching," to the operation. *Id.* at 30. When an access card is plugged into an unlooper a glitch or power interruption is created which induces a malfunction in the access card's computer and, in turn, defeats the card's security features. The unlooper has no utility with any other cards. *Id.* at 32. In response to the question, "The only places you see unloopers is within the DirecTV piracy community?" Mr. Gatliff answered,

"That's correct," *id.* at 34, and that the unlooper is "designed specifically for modifying the behavior of a DirecTV access card." *Id.* The White Viper website contained specific references to DirecTV and its equipment. *Id.*

According to Mr. Gatliff's testimony in the District Court, Debtor asserted in a deposition that he purchased the unlooper to use in an electromechanical device[12] that he had not yet built. Adv. Doc. No. 37, Tr. 4/10/07 at 40–42. At trial Debtor testified that he needed the unlooper to work with an electronic unlocking device that would use a smart card. Adv. Doc. No. 38, Tr. 4/11/07 at 5. When he ordered the unlooper he admitted he had nothing to use it with in connection with what he said he was inventing. *Id.* at 6. Mr. Gatliff testified that the records he examined established that Debtor had purchased the unlooper "quite a bit earlier" than the other materials. Adv. Doc. No. 37, Tr. 4/10/07 at 38–39.[13]

11. WildThing is a software program used in conjunction with an unlooper device to control the computer in an unlooper. It directs the glitches so that glitching events can be precisely timed under the control of the user's computer. Adv. Doc. No. 37, Tr. 4/10/07 at 34.

12. His idea was to use ammonia tanks to compress air which would provide cooling and heating to buildings. Adv. Doc. No. 37, Tr. 4/10/07 at 38. Because the unit, which would house electronic components, would be located outdoors, Debtor claimed he was trying to install a security system to keep people from entering the unit without permission. *Id.* The unlooper, he said, was needed to work with the electronic device that needed a smart card. *See* Adv. Doc. No. 38, Tr. 4/11/07 at 5–6. Debtor testified that he already had a card reader at the time he ordered the unlooper in July of 2000. *Id.* at 5. When asked whether he agreed with the expert testimony that the only purpose of an unlooper is to unlawfully capture DirecTV satellite signals, he responded that he did not agree or disagree because he was not an electrical engineer. *Id.* at 4–5.

Debtor denied that when he bought the unlooper in 2000 he had other equipment available to hack signals. However, his bank records, admitted into evidence in the District Court trial, contradicted his testimony and establish that he previously bought two card readers—one in September of 1999 and one in March of 2000. *Id.* at 27–28. He testified that even though the bank records showed that his debit card was used to make the purchases, somebody else must have done it. *Id.* at 29. There was no evidence whatsoever to support that theory.

13. Mr. Gatliff pointed out other discrepancies in Debtor's deposition:

A. .... That was one thing that struck me right away as being somewhat unusual about his claim.
Q. What other claims is the defendant making in relation to what his intended use of an unlooper was that struck you as odd?
A. Well, as I understood it, after reading his deposition and some sketches that he provided me through counsel was that this device that he was designing needed some

The credible testimony established that the only use for the items Debtor bought was to hack DirecTV's signals and that others had claimed legitimate uses for the same or similar materials but these items in fact had *no* other use. For example, all the ECMs in use from the year 2000 and after required the use of an unlooper to defeat the ECM. Adv. Doc. No. 37, Tr. 4/10/07 at 45–46. Mr. Gatliff's testimony established that a person who needs an unlooper to fix a DirecTV access card that was disabled by an ECM was engaged in the theft of DirecTV services because "the way the electronic counter-measures work is these mini programs are looking for signatures, data bytes in the access card that are consistent with what DirecTV identified at that time as being a piracy technique. To get those bytes into the card in the first place, you needed a tool like an unlooper, or in some cases, a reader/writer, which is the other White Viper device." *Id.* at 46–47. The card of a DirecTV subscriber would not have those bytes and so would not be affected by the ECM. *Id.* at 47. That is, purchase of an unlooper is not only an indication of a sort of physical security and someone suggested to him that a smart card could provide that physical security. And then somehow he learned that if you need a smart card, then you must also need an unlooper. And one of the texts he cited for that justification was the smart card developer's handbook that we have already discussed that doesn't mention unlooper. And the White Viper—the WildThing unlooper that he purchased from White Viper, there was no suggestion on White Viper's website that it was useful for that sort of work. But the thing that really struck me was the device in question that he was designing didn't really seem to need the sort of security that a smart card could provide in the first place.

Adv. Doc. No. 37, Tr. 4/10/07 at 39.

Mr. Gatliff further testified:

Q. How useful would a smart card programmer be or a smart card setup be if it were exposed to the elements over a period of time?

A. Yes, again, that was something that struck me after reading his deposition. I've designed systems that use magnetic stripe cards for physical access control and there's a reason they're used in places like airports and other exterior buildings is because the technology is very simple and is well suited to outdoor enclosures. Smart card systems in contrast because you have a little computer chip with very small contacts is not well suited for outdoor applications. . . . So, a smart card would be a poor choice for an exterior application like the one he was proposing.

Q. Would you experience any type of corrosion over time?

A. Yes, you would. Because in a smart card you would have these metal contacts that have to make a physical, electrical connection with the little pads on the smart card computer itself and those being metallic would be subject to corrosion. And a specific system with ammonia, ammonia is a fairly corrosive material, so you would expect to have even more corrosion problems in that setup.

Q. Generally speaking, is an unlooper useful for developing security of equipment?

A. No. You can—even at the date at issue, you can buy systems, some of which were based on smart cards that would serve as a good starting point for a physical security system, which is the term used to refer to things like gates and doors and so forth. A controlled access, physical security system, and for those sorts of products that use smart cards, the unlooper has no function because those smart card based systems use standards conforming smart cards and the smart card standards don't recognize the utility of an unlooper at all, except as a device for these induced error attacks.

Q. Over the past several years, have you reviewed legitimate use claims for unloopers?

A. Yes, sir, I have.

Q. Have you located legitimate use claims?

A. . . . I have not—after three years now, have not been presented with any legitimate use claim that held up to scrutiny. And, in fact, as part of my research, I even tried to contrive some of my own legitimate use claims for purposes of analysis, and . . . the only use that I've been able to identify for something like an unlooper is to attack DirecTV access card security. That is the only one that holds up to scrutiny Adv. Doc. No. 37, Tr. 4/10/07 at 41–44.

desire to continue hacking DirecTV, it indicates that an individual had previously been hacking into DirecTV. *Id.*[14]

The evidence established that Debtor bought various equipment from White Viper. Although he denied some purchases and contended that an email address and phone number associated with some purchases were not his, his bank records and the White Viper invoices indisputably connect him directly to the purchases, the use of which has been described above as only pertinent to hacking DirecTV signals. The credible evidence clearly established that the equipment Debtor bought could only be used for piracy of DirecTV's signals. It is equally clear from the trial transcript that Debtor purchased items whose only purpose and function is to pirate DirecTV signals. The testimony of other witnesses belies his assertion that he was engaged in a legitimate activity.[15] We find DirecTV has proven to a preponderance that Debtor knowingly and intentionally orchestrated theft of its signal.

We now turn to a discussion of the standards for dischargeability and whether DirecTV's judgment is nondischargeable.

## I. *Requirements for Nondischargeability Under § 523(a)(2)*

 Section 523(a)(2) provides that a debt is nondischargeable if it is

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's ... financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive

*In re Ozarowski,* 2006 WL 3694547 at *4 (Bankr.D.N.J., Dec. 12, 2006), held

for a debt to be nondischargeable under § 523(a)(2)(A) the creditor must prove that: (1) the debtor presented a fact, opinion, intention or law; (2) the representation was false; (3) the representation was material; (4) the debtor obtained money, property or services through the misrepresentation; (5) the debtor knew at the time that the statement was false (or made with reckless disregard for its truth); (6) the debtor intended the creditor rely on the statement; (7) the creditor actually relied on the statement; (8) the reliance was justified; (9) the creditor sustained damage; and (10) the damages were the proximate cause of the representation.

2006 WL 3694547 at *11–12. The trial transcript establishes that Debtor bought certain devices that enabled theft of DirecTV signals and in fact could be used only for that purpose. Although his conduct was fraudulent it did not involve a representation to DirecTV on which DirecTV relied. Until DirecTV investigated

---

**14.** There is no limit to the number of cards that can be fed through an unlooper to defeat an ECM. Adv. Doc. No. 37, Tr. 4/10/07 at 47–48.

**15.** Debtor's testimony was inconsistent as well. He first testified that he did not recall

buying a dish and receiver, Adv. Doc. No. 38, Tr. 4/11/07 at 9–10, then he said he bought it because a friend was getting married, *id.* at 11, or because it was to be a Christmas present, *id.* at 19, or because the friend was getting married at Christmastime. *Id.* at 18–19.

and conducted a raid of White Viper, there was no connection with Debtor with respect to piracy whatsoever. Debtor bought DirecTV systems through a retailer. DirecTV knew only that a system had been purchased. However, a subscription could be activated by anyone. *See* Adv. Doc. No. 37, Tr. 4/10/07 at 87–88.

■ To determine whether the jury's findings also satisfy § 523(a)(2), we must "examine the record of the [district] court proceeding." *In re Halperin,* 215 B.R. 321, 336 (Bankr.E.D.N.Y.1997). We must determine whether the requisite elements applicable under § 523(a) were decided in the prior proceeding. *Id.* In this regard, we examine the District Court trial record for the sufficiency of evidence regarding the controlling facts and to identify the issues that were litigated. *Id.* We conclude that in this case those requirements have been met. *See In re Cowden,* 337 B.R. 512, 530 (Bankr.W.D.Pa.2006).[16]

Section 2511(1)(a) of title 18 of the United States Code provides penalties for intentional interception or use of devices to intercept certain types of communication and subsection (1)(b) includes the intentional use (or attempt to use) a device that transmits a signal. Section 910 of title 18 of the Pennsylvania Statutes makes it a crime to possess, use or assemble "an unlawful telecommunication device" or one that "modifies, alters, programs or reprograms" one that could be used for commission of theft of telecommunication services. Section 605(e)(4) provides penalties for anyone who, *inter alia,* assembles or modifies any device or equipment "knowing or hav[ing] reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services." The elements for nondischargeability under § 523(a)(2)(A) are not identical to the requirements under the statutes resulting in the judgment at issue. Section 523(a)(2)(A) deals primarily with obtaining money, property or services through false pretenses, false representations, or actual fraud, and requires reliance by the creditor. Section 523(a)(2)(B) concerns use of a written materially false statement regarding a debtor's financial condition on which the creditor relied and with respect to which the debtor had an intent to deceive. It is clear from the District Court transcript that Debtor engaged in fraud but there is no evidence of DirecTV's reliance on Debtor's conduct. Section 523(a)(2)(B) does not apply inasmuch as there was no written statement regarding Debtor's financial condition and therefore there could be no reliance by DirecTV.

## II. *Requirements for Nondischargeability Under § 523(a)(4)*

■ Section 523(a)(4), in pertinent part, excepts from discharge a debt for

---

**16.** The bankruptcy court in *Cowden* identified the elements as follows:

As for federal principles of collateral estoppel, the Third Circuit, as set forth in its decisions over the years, has required varying combinations of the following elements to be present in order for collateral estoppel to apply:

(1) The issue sought to be precluded is the same as that decided in the prior action;

(2) That issue was actually litigated in the prior action;

(3) The resolution of that issue was determined by a valid and final judgment on the merits;

(4) The resolution of such issue must have been essential to the prior judgment;

(5) The party against whom the bar of collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and

(6) The party against whom such bar is asserted had a full and fair opportunity to litigate the issue in question in the prior action.

337 B.R. at 530 (citations omitted).

larceny. Larceny is defined as "the unlawful taking and carrying away of someone else's property with the intent to deprive the possessor of it permanently." *In re Giarratano*, 358 B.R. 106, 110 (D.Del. 2004), *citing Black's Law Dictionary* (8th Ed.2004). With respect to DirecTV's assertion that the debt is nondischargeable under § 523(a)(4) inasmuch as it constituted larceny, we note that fraudulent intent is essential to a finding of larceny and can be inferred from circumstances. *In re Dawley*, 312 B.R. 765, 779 (Bankr.E.D.Pa. 2004), *appeal denied* 2005 WL 2396489 (E.D.Pa., Sept. 28, 2005). We find the evidence at trial to be sufficient to establish the requisite intent and misappropriation. Debtor had been a DirecTV subscriber but his account was closed in 1999 for failure to pay, around the same time that his purchases of DirecTV systems, card readers and unloopers began. He made other purchases four days after the Black Sunday ECM. Purchases of systems were under Debtor's name and White Viper's and Debtor's records show that he bought equipment which the testimony established had no purpose other than piracy of DirecTV's satellite transmissions. To establish a claim of larceny, DirecTV must show that: (1) the Debtor misappropriated the services for his own benefit and (2) that he did so with fraudulent intent. *In re Giarratano*, 358 B.R. 106, 110 (D.Del.2004).

At the time Debtor was alleged to have purchased a DirecTV system in 1999 (for which service was never activated) he admitted that his name was on the receipt and that he lived at the address listed on the receipt but asserted that the telephone number on the receipt was one he had not had for the past two years. Adv. Doc. No. 37, Tr. 4/10/07 at 8–10. Immediately after denying that he made the purchase, *id.* at 9, he testified that had bought the system for a friend who was getting married. *Id.* at 11. He later said it was a Christmas

gift for someone. *Id.* at 19. Debtor attempted to excuse his failure to disclose the purchase in an earlier deposition on the fact that he was nervous. *Id.* at 11.

The record in the District Court contains ample evidence of Debtor's intentional and larcenous conduct with respect to interception of transmissions from DirecTV. This evidence includes Debtor's multiple purchases of DirecTV systems, card readers and an unlooper, Debtor's dealings with www.whiteviper.com, bank records reflecting transactions with that company, the strikingly similar email addresses associated with the White Viper orders, the use on purchase orders of a telephone number that at one time was Debtor's, Debtor's inconsistent and incredible testimony regarding his purchases and his intended use of the prohibited devices and DirecTV's credible evidence concerning the only purpose which the devices could serve. The debt in the amount of $70,450 is nondischargeable.

An appropriate order will be entered.

## ORDER

**AND NOW,** this 25th day of **June, 2009,** for the reasons expressed in the foregoing Memorandum Opinion, it is **ORDERED** that DirecTV's Motion for Summary Judgment is **granted in part and denied in part.**

It is **FURTHER ORDERED** that the motion to hold the judgment in favor of DirecTV nondischargeable under 11 U.S.C. § 523(a)(2) is **denied.** It is **ORDERED** that the motion to hold the judgment nondischargeable under 11 U.S.C. § 523(a)(4) is **granted.** Therefore, it is **ORDERED** that the debt owed to DirecTV by Debtor in the amount of $70,450 is **nondischargeable.**

It is **FURTHER ORDERED** that Debtor shall file and serve an amended plan on or before **July 27, 2009.**